IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **L.D. and M.D.,** : | |
| : | |
| Plaintiffs, : | |
| v. : | **CIVIL ACTION NO. 23-345** |
| : | |
| **INDEPENDENCE BLUE CROSS,** : | |
| : | |
| Defendant. : | |

**Perez, J.**                                                                                                          **October 18, 2024**

## MEMORANDUM

Plaintiffs L.D. and M.D. (collectively, "Plaintiffs") bring this action against Defendant Independence Blue Cross ("IBX"), alleging IBX's denial of benefits violate the Employee Retirement Income Security Act ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"). Before the Court are cross-motions for summary judgment. For the reasons that follow, the Court grants summary judgment in IBX's favor.

**I.      BACKGROUND**

Plaintiff L.D. and his son, M.D., were enrolled in a Personal Choice Preferred Provider Organization Silver plan ("the Plan") through L.D.'s employer. A.R. 3908, 4087. M.D. was born in 2003 and identifies as transgender. *Id.* at 36, 64. Throughout his teenage years, M.D. struggled with self-harm, suicidal ideation, alcohol and drug abuse, and overdose episodes, resulting in five inpatient crisis hospitalizations. *Id.* at 76-77. On May 23. 2020, M.D. was admitted to The Newport Academy ("Newport"), a residential treatment facility. *Id.* at 1524. While at Newport, M.D. "stabilized" and "began to address some of his issues with mental health and substance use[.]" *Id.* at 1034. Notwithstanding his progress, some of M.D.'s healthcare providers recommended he be admitted to a residential treatment center to "to provide more skills and coping methods to manage

& process trauma before returning home." *Id.* at 581; *see also id.* at 578 (recommending residential treatment); *id.* at 571 (same).

M.D. was discharged from Newport on July 22, 2020. *Id.* at 1524. The Newport discharge summary stated that M.D.'s "Treatment Team at Newport Academy is recommending that [he] transition into an Out of Home Placement following his treatment at Newport Academy." *Id.* It continued: "Due to family decision [M.D.] is transitioning to Elevations RTC on 7/22/2020." *Id.* M.D. was admitted to Elevations Residential Treatment Center ("Elevations") from July 22, 2020, through December 21, 2020. *Id.* at 586. On July 24, 2020, IBX denied coverage for M.D.'s treatment at Elevations, finding it was not medically necessary. *Id.* at 109.

The Plan "only covers treatment which it determines Medically Necessary." *Id.* at 4062. Residential treatment is considered medically necessary for a child or adolescent if they are a danger to themselves or others, or if they exhibit "[m]oderately severe [p]sychiatric, behavioral, or other comorbid conditions for child or adolescent" and a "[s]erious dysfunction in daily living." *Id.* at 1705. Treatment must also not be feasible at a less intensive level of care. *Id.* The Plan uses established "medical guidelines based on clinically credible evidence to determine the Medical Necessity of the requested services." *Id.* at 4193. This process is called utilization review. *Id.* IBX delegates utilization review for mental health/psychiatric and substance abuse services to Magellan Behavioral Health ("Magellan"). *Id.* at 109.

Magellan reviewed Plaintiffs' claims for coverage and determined that the medical necessity criteria was not met. *Id.* In a denial letter dated July 24, 2020, Magellan provided the following reasoning for the denial:

> You presented with mental health issues. Medical necessity criteria based on 2020-2021 Magellan Care Guidelines for Residential Behavioral Health Level of Care, Child or Adolescent, is not met. This was because your symptoms do not appear to require a twenty-four (24) hour per day, seven (7) day per week treatment facility

> to help you learn how to take care of your daily living needs. You are able to care for your physical needs. You are not at risk of being dangerous to yourself or others. Where you live does provide the help you need to get better. Your current symptoms would be safely treated at a less restrictive level of care. Recommended level of care is Outpatient.

*Id.* at 110.

Plaintiffs appealed this decision to IBX on December 31, 2020. *Id.* at 64. On March 16, 2021, IBX upheld the denial. *Id.* at 13. In the second denial letter, IBX reviewed the applicable guidelines, overviewed the information it considered, and provided its findings. *Id.* at 13-16. In support of its denial, IBX stated:

> Based on the clinical documentation submitted for review, the appeals committee has determined that medical necessity criteria have not been met for approval of the residential level of care from July 22, 2020 thru March 8, 2021. The member is not suicidal, homicidal, assaultive, or psychotic. There are no significant risk issues or behaviors requiring treatment at the residential level of care. The documentation submitted indicates that he had been stabilized in a residential treatment facility prior to transitioning to Elevations and had no ongoing acute active risk issues. Although the member has a history of abusing substances, he had been maintaining sobriety and had no ongoing signs or symptoms of withdrawal. Therefore, the original denial is upheld.

*Id.* at 16.

Plaintiffs filed a second appeal on May 3, 2021. *Id.* at 985. On June 22, 2021, IBX upheld the denial again. *Id.* at 33. In its second-level appeal denial letter, IBX overviewed who was on the appeal review committee, provided the applicable guidelines, summarized the information considered, and outlined its findings. *Id.* at 33-38. The committee findings were as follows:

> Based on the clinical documentation submitted for review, member handbook and Magellan guidelines, residential treatment between July 22, 2020 and March 08, 2021 does not meet the plan's definition of medical necessity. Mica had no suicidal or homicidal ideation, psychosis, severe mood symptoms, self-injurious behavior, or physical aggression. There were no acute medical concerns. There were no post-acute withdrawal symptoms. At the time of admission, there were no symptoms or behaviors that required 24-hour-a-day, 7-day-a-week supervision and observation or frequent medical and nursing care. There is no evidence that he would require a higher level of care in the absence of residential treatment or that he could not receive support and access to therapeutic services outside a residential setting.

> There were alternative interventions which would be equally or more effective. His symptoms and behaviors could have been addressed in a less restrictive setting.

*Id.* at 36-37.

Having exhausted their prelitigation appeal obligations, Plaintiffs filed the instant action. Count I alleges that that IBX's denial of benefits violated Section 502(a)(1)(B) of ERISA by failing to provide Plaintiffs a full and fair review, resulting in an arbitrary and capricious denial of coverage. Count II alleges that IBX violated the Parity Act by imposing more stringent treatment limitations on mental health and substance use disorder benefits than are imposed on medical and surgical benefits.

## II.   LEGAL STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.,* 954 F.3d 615, 618 (3d Cir. 2020). A dispute as to those facts "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   DISCUSSION

Plaintiffs argue that IBX violated Section 502(a)(1)(B) of ERISA by arbitrarily and capriciously denying coverage for M.D.'s treatment at Elevations. *See* 29 U.S.C. § 1132(a)(1)(B). Plaintiffs also assert that IBX violated the Parity Act by imposing more stringent treatment limitations on mental health and substance use disorder benefits than are imposed on medical and surgical benefits.

A.     **Section 502(a)(1)(B) ERISA Claim**

1.     **Standard of Review**

An administrator's denial of benefits "is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011)). In contrast, the decision "is not arbitrary if it is reasonably consistent with unambiguous plan language." *Id.* (internal quotation marks omitted). In deciding whether an administrator acted arbitrarily and capriciously, the Court must "defer to an administrator's findings of facts when they are supported by substantial evidence," which is "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Id.*

"When reviewing an administrator's factual determinations, we consider only the 'evidence that was before the administrator when he made the decision being reviewed.'" *Id.* (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 2011)). The Court may not "substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life and Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). As such, "[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller*, 632 F.3d at 845, n.2.

2.     **Denial of Benefits**

To qualify for benefits, the Plan required that treatment be medically necessary. A.R. 4062. The Court must therefore determine whether IBX's determination that M.D.'s treatment at Elevations was not medically necessary was arbitrary and capricious. In reviewing an administrator's decision, courts must consider "various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the

particular ERISA plan was funded." *Miller*, 632 F.3d at 845. "Whereas the structural inquiry focuses on the financial incentives created by the way the plan is organized, i.e., whether there is a conflict of interest, the procedural inquiry focuses on how the administrator treated the particular claimant." *Id.* (internal quotation marks omitted). The procedural inquiry examines irregularities that suggest arbitrariness, including:

> (1) reversing a decision to award benefits without new medical evidence to support the change in position, (2) relying on the opinions of non-treating over treating physicians without reason, (3) conducting self-serving paper reviews of medical files, (4) failing to address all relevant diagnoses before terminating benefits, (5) relying on favorable parts while discarding unfavorable parts in a medical report, or (6) denying benefits based on inadequate information and lax investigatory procedures.

*Emmerling v. Standard Ins. Co.*, No. 14-5202, 2015 WL 5729240, at *6 (E.D. Pa. Sept. 30, 2015).

The Parties focus the breadth of their arguments on the procedural inquiry,[1] with Plaintiffs arguing that IBX (1) did not acknowledge or engage with the opinions of M.D.'s treating physicians; (2) initially denied coverage based solely on M.D.'s mental health symptoms without addressing his substance use disorders; and (3) conducted a self-serving paper review and ignored unfavorable parts of M.D.'s record.

---

[1] Plaintiffs make a passing reference to the substantive inquiry, contending that IBX's "self-serving and cherry picked" review of the record is "prima facie evidence that its inherent conflict of interest as the adjudicator and payor of claims affected its decision-making." ECF 55 at 11. A conflict arises where the administrator "both funds the plan and evaluates the claims." *Miller*, 632 F.3d at 847. If a conflict exists, "the significance of that conflict is case-specific and merely one factor for a court's consideration." *Emmerling*, 2015 WL 5729240, at *5. Plaintiffs' cursory mention of this conflict is indicative of its limited impact here. Because IBX both funds the Plan and evaluates the claims, an inherent conflict exists. IBX has ameliorated the effects of this conflict by delegating utilization review for mental health and alcohol and drug abuse benefits to Magellan. Notwithstanding this, IBX is still involved in appeal determinations. As such, this conflict slightly weighs in favor of Plaintiffs' claim, but structural conflicts of interest are only one factor courts consider when determining whether a denial of benefits was arbitrary and capricious.

a.  **Analysis of Treating Physicians' Opinions vs. Non-Treating Physicians**

ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003). At the same time, "administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. Plaintiffs contend that IBX ignored the opinions of three treating clinicians: Emily M. Pfizenmayer, M.Ed., Mr. Spencer MacDonald, and Mr. Jordan C. Gray. IBX denies this allegation and highlights the opinion of Dr. Naiyar Zaman.

Magellan's internal notes referenced M.D.'s history of substance abuse, history of verbal aggression, and his gender transition. A.R. 3838. The internal notes also stated that M.D. was not experiencing suicidal and homicidal ideations nor was he feeling "hopeless or helplessness" at the time of his discharge from Newport. *Id.* In its first-level appeal denial letter, IBX referenced M.D.'s history of depression, anxiety, and suicidal thoughts. *Id.* at 15. Additionally, the second-level appeal denial letter discussed M.D.'s history of drinking since the age of fourteen, his past treatment, and his erratic behavior. *Id.* at 36. The bases for these findings can be found in the records provided by M.D.'s healthcare providers. *See id.* at 570 (Ms. Pfizenmayer, M.D.'s primary therapist prior to his time at Newport, discussing M.D.'s history of substance abuse and aggressive tendencies); *id.* at 578 (Mr. MacDonald, M.D.'s family therapist at Newport, acknowledging M.D.'s trauma and suicidal history); *id.* at 581 (Mr. Gray, M.D.'s individual therapist while at Newport, overviewing M.D.'s experience at Newport).

Although the record and M.D.'s healthcare providers chronicle his trauma and struggle with mental health, there is substantial evidence that supports the conclusion that residential

treatment was not medically necessary. Dr. Zaman, a physician who treated M.D. at Newport, noted that M.D. denied any suicidal or homicidal ideations. A.R. 3742. M.D. stated he had no concerns, and Dr. Zaman observed that M.D. was not in distress, reported his anxiety as manageable, denied any substance use or cravings, and had improved insight and judgment. *Id.* The day before M.D. was discharged from Newport, Dr. Zaman wrote: "No concerns. Happy to have plans of discharge tomorrow to a boarding therapeutic school." *Id.* In addition, Mr. Gray acknowledged "an appreciation and hope for future endeavours [sic] and family relationships." *Id.* at 581.

The fact that Ms. Pfizenmayer, Mr. MacDonald, and Mr. Gray recommended residential treatment does not mandate a finding of medical necessity. *See Emmerling*, 2015 WL 5729240, at *9 ("When an evaluating physician is able to point to reliable evidence conflicting with a treating physician's evaluation, as it has here, the Court is 'constrained to conclude that there was substantial evidence supporting the denial.'" (quoting *Steele v. Boeing Co.*, 225 F. App'x 71, 75 (3d Cir. 2007))). The Court is sympathetic to M.D.'s circumstances, but "it is up to the plan administrator's discretion to weigh the medical evidence." *Id.* Here, the record shows that IBX credited M.D.'s treating providers' opinions in making its determinations.

### b.  Analysis of All Relevant Diagnoses

"[A]n administrator's failure to take into account multiple documented diagnoses suggests that a denial of benefits was not the product of reasoned decision-making." *Miller*, 632 F.3d at 853. Plaintiffs argue that IBX failed to consider M.D.'s substance use disorder when it initially denied coverage. Magellan's internal notes acknowledged that M.D. had a history of substance abuse, but the initial denial letter stated only that M.D. "presented with mental health issues." *Id.* at 110, 3838. In the first-level appeal denial letter, IBX stated: "Although [M.D.] has a history of

abusing substances, he had been maintaining sobriety and had no ongoing signs or symptoms of withdrawal." *Id.* at 16. The second-level appeal denial letter also acknowledged the complexity of M.D.'s case, detailing his history of substance abuse. *Id.* at 36. The record therefore shows that IBX considered both M.D.'s mental health struggles and his substance abuse disorder when deciding to deny coverage.

### c. Analysis of Unfavorable Parts of the Record

Conducting a "self-serving paper review of medical files" or "relying on favorable parts while discarding unfavorable parts" of the record is indicia of arbitrariness. *Emmerling*, 2015 WL 5729240, at *6. Plaintiffs argue that IBX ignored parts of the record that suggested M.D. would not commit to remaining sober without residential treatment and disregarded the healthcare providers who recommended residential treatment. For example, IBX acknowledged M.D.'s struggles before and during his time at Elevations—including him sneaking in drugs and expressing a desire to take hallucinogens—but then discussed M.D.'s improvements as a basis to deny coverage. A.R. 36. IBX responds that M.D.'s setbacks at Elevations do not warrant a conclusion that IBX's denial of benefits was arbitrary and capricious.

The Court agrees that setbacks alone do not demonstrate a denial was arbitrary and capricious. *See Hurst v. Siemens Corp. Grp. Ins.*, 42 F. Supp. 3d 714, 732-33 (E.D. Pa. Aug. 27, 2014) ("While subsequent events may indicate that D.H. would have benefitted from further residential treatment at Timberline Knolls, it was not arbitrary and capricious, as discussed above, for CBH to conclude as of May 9, 2012 that, based on the improvement of D.H.'s symptoms and the availability of treatment at a lower level of care, it was no longer medically necessary for D.H. to remain in continued residential treatment"). Further, Plaintiffs' argument is essentially a

rehashing of the others. As discussed above, IBX's denial letters acknowledged that M.D. struggled with substance abuse and mental health issues, including during his time at Elevations.

Upon careful review and consideration, the Court concludes that the record is devoid of procedural anomalies that suggest IBX acted arbitrarily and capriciously. "As it is up to the plan administrator's discretion to weigh the medical evidence, so long as the administrator's decision is supported by substantial evidence, the Court may not substitute its own judgment." *Emmerling*, 2015 WL 5729240, at *9 (internal quotations omitted).

### B. Parity Act Claim

The Mental Health Parity and Addiction Equity Act of 2008, also known as the Parity Act, requires that "treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). It also proscribes "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.* "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). We review the Parity Act claim *de novo*. *Galante v. Fin. Indus. Reg. Auth., Inc.*, No. 16-5198, 2018 WL 2063748, at *7 (E.D. Pa. May 2, 2018).

Courts have held that plaintiffs establish a Parity Act claim where:

> (1) the insurance plan is of the type covered by the Parity Act; (2) the insurance plan provides both medical benefits and mental-health benefits; (3) the plan has a treatment limitation . . . that is more restrictive for mental-health treatment than it is for medical treatment; and (4) the mental-health treatment limitation is in the same classification as the medical treatment to which it is being compared.

*Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 54 (W.D.N.Y. 2020); *see also E.W. v. Health Net Life Ins. Co.,* 86 F.4th 1265, 1282 (10th Cir. 2023) (collecting cases). The Parties dispute elements three and four.

Plaintiffs allege that IBX imposes more stringent treatment limitations on mental health and substance use disorder benefits than are imposed on medical and surgical benefits—specifically, treatment in skilled nursing facilities ("SNFs") and inpatient hospice. Beginning our analysis with the fourth element of a Parity Act claim, courts have already recognized SNFs and inpatient hospice facilities as analogous to care at a residential treatment center. *See, e.g., E.W.*, 86 F.4th at 1288-89 (explaining that federal regulations demonstrate that treatment in SNFs and residential treatment centers are comparable); *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1159 (9th Cir. 2018) (explaining that care at a residential treatment facility and SNFs are analogous); *D.K. v. United Behav. Health*, No. 2:17-cv-01328, 2020 WL 4201263, at *3 (D. Utah July 22, 2020) (concluding that hospice care is analogous to residential treatment for mental health and substance abuse issues). Indeed, "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance use[] disorders as an inpatient benefit." *E.W.*, 86 F. 4th at 1288 (quoting 78 Fed. Reg. 68240, 68247 (Nov. 13, 2013)). Because inpatient SNFs and inpatient hospice care are analogous to care in a residential treatment center, Plaintiffs satisfy the fourth element.

With respect to the third element, Plaintiffs assert that IBX's guidelines defer to the opinions of treating professionals in the SNF and inpatient hospice context but do not provide similar deference to the opinions of treating clinicians in the mental health and substance use

disorder context. To qualify for residential treatment, the Magellan guidelines provide all the following must be indicated:

- Danger to self for child or adolescent
- Danger to others for child or adolescent

. . .

- Moderately severe Psychiatric, behavioral, or other comorbid conditions for child or adolescent
- Serious dysfunction in daily living for child or adolescent

A.R. 1705. In addition, treatment must not be feasible at a less intensive level of care, and there must be no anticipated need for physical restraint or seclusion, among other requirements. *Id.*

In comparison, admission to an SNF is considered medically necessary when:

- The individual is medically stable
- Treatment was ordered by an eligible professional provider
- The individual needs skilled services on a daily basis
- The services are not available in a less-intensive setting
- The frequency, quantity, and intensity of these services are necessary for management of the individual's diagnosis

*Id.* at 4305. Further, documentation within the past twenty-four hours regarding an individual's condition—including current functional status and recent measured progress toward goals—must be provided, among other requirements. *Id.* at 4308. Lastly, to receive coverage for inpatient hospice care, the care must be delivered in accordance with a treatment plan. ECF 47-4. The individual's attending physician and the hospice medical director must also certify that the individual has a terminal illness with an anticipated life expectancy of six months or less. *Id.*

A careful review of the guidelines show that Plaintiffs have not demonstrated a Parity Act violation. "The fact that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity; it is a logical consequence of the undeniable reality that every illness is inherently different and requires different treatment." *James C. v. Anthem Blue Cross*

*and Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021). The guidelines for residential treatment compared to those for SNFs and inpatient hospice care are necessarily different as they target different types of illnesses and treatments.

The Parity Act requires that the guidelines be comparable, not identical. *James C.*, 2021 WL 2532905, at *20. In *James C.*, the court found no disparity where admission for residential treatment required "self injurious or risk taking behaviors that risk serious harm" but SNF treatment "only require[d] that a condition need skilled care . . . ." *Id.* (internal quotation marks omitted). The same is true here. Admission to a residential treatment center requires that an individual pose a danger to themselves or others, and admission to a SNF requires that an individual need skilled services on a daily basis. "While these standards are clearly different, they are neither disparate nor incomparable, as they both stem from the guidelines' rationale that the need for treatment is governed by the severity of a patient's illness." *James C.*, 2021 WL 2532905, at *20. Similarly, the inpatient hospice requirement than an individual have a terminal illness with an anticipated life expectancy of six months or less is analogous to the residential treatment requirement that treatment not be feasible at a less-intensive level of care. Indeed, the inpatient hospice criterion essentially requires a finding that the individual's illness cannot be managed at a lesser level of care. *Cf. Julie L.,* 447 F. Supp. 3d at 55 (concluding the same where admission to an SNF required a determination that "it would be unsafe to return to one's place of residence.").

When read in context, the guidelines for residential treatment are comparable to those for SNFs and inpatient hospice care. Because "the difference in requirements is not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment

at those facilities," the Court declines to find a Parity Act violation. *Michael P. v. Aetna Life Ins. Co.*, No. 2:16-cv-00439, 2017 WL 4011153, at *7 (D. Utah Sept. 11, 2017).[2]

## IV.     CONCLUSION

For the reasons stated, IBX's motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied. An appropriate order follows.

---

[2] IBX argues that, even if there is a Parity Act violation, Plaintiffs do not have Article III standing because they have no concrete injury. Because the Court has concluded that the ERISA and Parity Act claims fail, it is immaterial whether Plaintiffs have asserted a concrete injury.